**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

AUBIN INDUSTRIES, INC.,

               Plaintiff,

       v.                              C-1-04-681

JEFF SMITH, *et al.*,

               Defendants.

**MEMORANDUM OPINION AND ORDER**

This civil action is before the Court upon motions for summary judgment filed by defendants Wellington Industrial Group, Inc. (Wellington), Colson Caster Corporation (Colson Caster), Colson Group Inc., (Colson Group), Jeff Smith, and Standex International Corporation (Standex) (doc. 70); by defendant Wellington (doc. 72); and by plaintiff Aubin Industries, Inc. (Aubin) (doc. 73).  The case is also before the Court upon plaintiff's motion to strike portions of the declarations submitted by defendants (doc. 91).  The parties have consented to disposition by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

**I. Introduction**

Plaintiff Aubin is a corporation organized under the laws of the State of Nevada with its principal place of business in California.  Defendants are citizens of states other than California.  This dispute arises out of the sale and distribution of liquid cast polyurethane industrial wheels designed and manufactured by Aubin at its facilities in California.  The specific wheel at issue is

known as the "Half-Round wheel" used in the automotive industry in parts carts, which in turn are used to deliver automobile parts to the assembly line. In the second amended complaint, plaintiff makes the allegations set forth in the following paragraphs of this section regarding the dealings it purportedly had with defendant regarding the Half-Round wheel.

Plaintiff entered into an agreement with Wellington whereby Wellington would purchase its requirements exclusively from plaintiff, and in exchange, plaintiff agreed to manufacture as many of its Half-Round wheels as Wellington could sell. From approximately late 1998 or early 1999 through late 2000, in accordance with the terms of the agreement, plaintiff manufactured and supplied its Half-Round wheel to Wellington and Wellington marketed and distributed the wheel to the automotive industry. After a rigorous testing program conducted by Honda of North America, plaintiff's Half-Round wheel was chosen as the best wheel for the Honda plants in North America.

In 2001, in response to Honda's increasing demand for the Aubin Half-Round wheel, Jeff Smith of Wellington represented to Aubin that it could expect substantial sales in the range of 360,000 units over the next three years. Smith asked plaintiff to provide its lowest and best price for its Half-Round wheel so that it would be competitively priced for sales to Honda. Based upon Smith's representations, plaintiff obtained the lowest and best price for the respective parts of the Half-Round wheel for each of its suppliers based on Smith's representation of 360,000 wheels over the next three years. Plaintiff also began an extensive and expensive expansion program, spending over $600,000 to meet the expected and represented demand of 360,000 Half-Round wheels.

In April 2001, Smith informed plaintiff that he had sold Wellington to defendant Standex

in early 2000 and that Standex wanted a supply agreement for the 360,000 units for the next three years and was preparing the written confirmation. Throughout 2001, in accordance with the terms of the parties' agreement, plaintiff continued to manufacture and supply its Half-Round wheel to Wellington and Wellington continued to market and distribute the Half-Round wheel to the automotive industry. Plaintiff's sales of the wheels continued to increase every month through 2001.

In approximately May 2001, Smith visited plaintiff's plant in California on the express condition that he keep everything he saw and heard in strict confidence. Smith agreed. Plaintiff's sales subsequently dropped from 3070 units in February 2002 to 24 units in March 2002. When plaintiff inquired of Smith and Wellington as to the reason, Smith explained that Honda's business had slowed down due to the weakening economy. Although Wellington increased its orders of the Half-Round wheel in May 2002 through July 2002, the orders were still thousands of units short of the orders sold throughout 2001.

On or about August 14, 2002, plaintiff discovered that Jarvis Caster Company ("Jarvis"), a former division of Standex and a current division of Colson Caster, had manufactured a "knock-off" of plaintiff's Half-Round wheel that it was advertising as the "Magnum Wheel." Jarvis continued to advertise and sell the wheel on its website until approximately June 2005, after this lawsuit was filed. Upon information and belief, defendants conspired and acted in concert to manufacture a polyurethane wheel identical to plaintiff's Half-Round wheel, enabling defendants to deceitfully switch their wheel into Honda's automobile manufacturing plants throughout North America without being subject to Honda's rigorous testing by Honda, thereby wrongfully undercutting plaintiff's business and competition.

3

On August 15, 2002, plaintiff received a fax from Wellington cancelling an August 14, 2002 order for 1000 units without explanation. Defendants ceased doing business with plaintiff after this date.

Plaintiff brings claims against defendants Wellington and Standex for breach of a partly written, partly oral distributorship agreement that was purportedly modified in May of 2001, pursuant to which plaintiff agreed to sell its Half-Round wheel for the automobile manufacturing industry exclusively to Wellington and Standex and these defendants agreed to purchase plaintiff's wheel exclusively from plaintiff for distribution in the automotive industry for a minimum term of three years from May 2001. Plaintiff claims that Wellington and Standex breached the agreement by arranging for their affiliate Jarvis to copy and manufacture a "knock-off" using specifications plaintiff provided to defendants with the express agreement that the information was secret proprietary information that was not to be disclosed to any other person; by manufacturing for themselves, or purchasing "knock-offs" of, the wheel type for sale to others, including Honda and other automobile manufacturers; and by terminating the agreement without cause on August 15, 2002, and ceasing doing business with plaintiff. (**Count I**).

Plaintiff brings a second claim against defendants Wellington and Standex for breach of a "Requirements Contract," a series of agreements, partly oral and partly written, that defendants purportedly entered into between 1998 and 2001 whereby defendants agreed Wellington would purchase all its requirement for the Half-Round wheels from plaintiff. Plaintiff claims that defendants breached the agreement by establishing its own facility to manufacture wheels of plaintiff's Half-Round wheel type and purchasing or obtaining wheels to meet such requirements from entities other than plaintiff. Plaintiff claims that the contract was modified in or about May

4

2001 to include an estimate of 360,000 wheels over the ensuing 3-year period and that defendants breached the contract by failing to purchase a quantity of wheels from plaintiff that was proportionate to the quantity stated in the contract. Plaintiff claims it was justifiably ignorant of such breach until August 2002. Plaintiff claims that as a result of the breach, it has sustained damages in excess of $1,000,000 in lost profits on sales of wheels and expenditures in expanding the plant and capacity and negotiating supply agreements based on higher estimates. **(Count II).**

Plaintiff brings a claim against Wellington for breach of partnership/joint venture. Plaintiff claims that in early 1998 or early 1999, it entered into a partnership or joint venture with Wellington to exploit the market for plaintiff's Half-Round wheels with Honda of America Manufacturing, Inc. and other automobile manufacturers. Plaintiff claims that in or about the first half of 2002, Wellington violated its fiduciary duties under the agreement by secretly and deceptively appropriating to itself the partnership opportunities of selling wheels virtually identical to those designed and manufactured by plaintiff to Honda and others and the opportunity to manufacture such wheels. Plaintiff claims that it has sustained damages in an amount exceeding $1,000,000 as a result of the beach and is entitled to an accounting and to a judgment against Wellington for revenue received by Wellington or any of its affiliates or agents in violation of its fiduciary duty to the partnership/joint venture. **(Count III).**

Plaintiff also brings claims against defendants Smith, Wellington and Standex for negligent and fraudulent misrepresentation. Plaintiff claims that in an April 2001 telephone conversation and in a May 2001 meeting with plaintiff's Phil Aubin, Smith, acting in the course and scope of his agency for Wellington, represented to Phil Aubin that defendants recognized

5

and would protect the secrecy of plaintiff's proprietary manufacturing process and the composition of its wheels as a trade secret and its lowest and best prices for the sale of same, and would not disclose or otherwise utilize plaintiff's process or secrets. Plaintiff also alleges that Smith represented to plaintiff in 2001 that it could expect substantially increased sales in the range of 360,000 units over the next three years. Plaintiff claims that defendants, however, intended to manufacture and sell a "knock-off" of plaintiff's Half-Round wheel and obtain the profits for themselves. Plaintiff also claims that Smith misrepresented the consequent decline in plaintiff's sales to be the result of general economic conditions when the decline was in fact the result of defendants' sale of the "knock-off" wheels. Plaintiff claims that it relied on these misrepresentations, which defendants knew to be false, to its detriment. **(Counts IV, V)**.

Plaintiff brings a claim against all defendants for violation of the Ohio Trade Secrets Act, Ohio Rev. Code § 1333.61. Plaintiff claims that the design, information, process, procedure, and formula used for the manufacture and sale of its Half-Round wheel is a trade secret and that defendants misappropriated its trade secret by improper means. **(Count VI)**. Plaintiff also brings a claim against all defendants for violation of Ohio Rev. Code § 4165.02, the Deceptive Trade Practices Act **(Count VII)** and for unfair competition **(Count VIII)**. Plaintiff claims that defendants violated the Act when they misrepresented to third parties, including but not limited to Honda, that the Half-Round wheel was a Wellington product, switching their wheel for plaintiff's without it being subject to Honda's rigorous testing and wrongfully undercutting plaintiff's business and competition, which caused plaintiff to sustain damages in an amount believed to be in excess of $1,000,000.

Plaintiff also brings a civil conspiracy claim against all defendants, claiming that they

acted in concert to misappropriate plaintiff's trade secrets and engage in unfair competition and deceptive trade practices **(Count IX).**

Finally, plaintiff brings an action for injunction pursuant to Ohio Rev. Code §§ 1333.62 and 4165.03 against defendants Colson Caster, Colson Group and Wellington seeking to enjoin them from manufacturing and selling their "Magnum Wheel."

## II. The motions for summary judgment

Defendants move for summary judgment on all claims brought against them, except that defendants Wellington and Standex have not specifically addressed plaintiff's breach of joint venture claim brought against them. Plaintiff moves for summary judgment in its favor on the breach of partnership/joint venture claim, the Ohio Trade Secrets Act claim, the Deceptive Trade Practices Act claim, and its unfair competition claim.

## III. Facts

The parties have submitted proposed findings of fact and conclusions of law in support of their motions for summary judgment, which the opposing side has marked as true, false or irrelevant. The facts set forth below are undisputed.

1.  Aubin Industries, which is owned and operated by Philip Aubin, is a manufacturer of numerous types of liquid cast polyurethane industrial wheels located in California.

2.  The wheel at issue in this case is the "Half-Round wheel," which is a donut-style polyurethane tread on an aluminum core. These wheels, which are assembled together with casters, are attached to carts that are used to deliver automobile manufacturing parts from the supplier through the transportation chain to the automobile manufacturing plant and then to the automobile manufacturing assembly line.

7

3.  Aubin had an oral agreement with non-party Bestway Casters (Bestway) that Bestway would supply all Half-Round wheel requirements of Bestway and Bestway would purchase all of its Half-Round wheel requirements from Aubin.

4.  From 1984 through January 2000, Jeff Smith was President and owner of Wellington, a Cincinnati company that assembles and distributes casters. During the 1990s, Wellington was supplying casters to several of Honda of America's manufacturing facilities located in Marysville, Ohio.

5.  Smith's contact at Honda informed him that Honda wanted a caster that Honda was currently receiving from a company called R & K, a wheel manufacturer in California.

6.  Smith knew that Phil Aubin had left R & K and started his own wheel business.

7.  Aubin asserts that in one conversation in 1999, Smith, on behalf of Wellington, orally agreed to a distributorship and supply agreement for the Half-Round wheel. Phil Aubin, on behalf of Aubin, testified at his deposition that there are no documents that exist to support the existence of this distribution and requirements agreement. Phil Aubin has stated that he believes he had an agreement with Smith to "team up in the United States for the automotive, that [Smith] would market – if [Aubin] would give him an exclusive and help to protect him in the automotive industry in the United states, that [Smith] would spend the time and the effort to show the parts and go after the automotive market."

8.  Aside from the 30-minute conversation with Smith in 1998, and despite the fact that Phil Aubin and Smith talked on a regular basis from 2000 to 2002, Aubin admits the parties never discussed the alleged contract again.

8

9.      A few weeks after the 1998 conversation, Smith called Phil Aubin back and asked for a sample of the Half-Round wheel.  Two days later, Aubin received an order from Wellington for 420 Half-Round wheels, which Aubin shipped to Wellington.  The order was sold by Wellington to Honda of America in Marysville.

10.     In 1998 and 1999, Wellington placed two orders for wheels with Aubin.

11.     In early 2000, Aubin began receiving more orders for its Half-Round wheels from Wellington and business continued to increase throughout the year.

12.     Smith sold the assets of Wellington to Standex in 2000 but remained on as an employee to run the Wellington business in Cincinnati.  At the time of the purchase, Standex already owned a wheel manufacturer, which it operated under the name Jarvis Caster.

13.     From 2000 to 2002, Wellington/Standex purchased Half-Round wheels from Aubin, which were assembled into casters.  Wellington/Standex did not sell its casters directly to Honda but rather sold the casters to its distributor, Caster Connections, a company that eventually sold the casters to various Honda plants at Marysville as well as to other customers.

14.     Wellington and Wellingon/Standex do not tell their customers and distributors the name of the manufacturer of each part that is placed in a caster.

15.     At some pint, Honda opened a logistics facility that was designed to test equipment and then recommend products to the various manufacturing facilities at the Honda plants. Pati Radford was the employee responsible for this testing facility.  To perform the tests, Radford testified at her deposition that she solicited wheels and casters from many sources.  Once her testing was complete, she would give the test results to the distributor

9

who supplied the wheels or casters.

16. On an unknown date, Smith attended a meeting at Honda in Marysville where Honda discussed with Smith its projections for how many carts Honda would be using over the next three years, coinciding with model changes on their automobiles.

17. Smith subsequently conveyed that information to Phil Aubin and stated that Honda was projecting 360,000 units over three years, or 10,000 wheels per month. Smith specifically told Aubin that this number was a projection and Aubin knew that neither Smith nor Wellington had a contract for 360,000 wheels. Aubin understood that this order was not "guaranteed" by Honda.

18. Based upon these projections, plaintiff started contacting its suppliers to get pricing.

19. On May 4, 2001, Aubin sent Smith a fax that read:

> PRICING:     3 YR CONTRACT 10,000 PER MONTH MINIMUM
>              BEG 6/1 OR LATER.

The fax offered several prices and "F.O.B. FACTORY" "TERMS 2% - 10, NET 30."

20. Upon receipt of the fax, Smith told Aubin that he could not enter into a contract because Honda itself would not contract to purchase three-years' worth of goods.

21. Even after receipt of the fax, Wellington/Standex continued to order and receive Half-Round wheels from Aubin and used those wheels to make casters, which were sold to Wellington's distributor, Caster Connection, and then eventually sold to Honda.

22. Smith visited plaintiff's manufacturing facilities in California on May 16, 2001. During the visit, Smith spent no more than 30 minutes viewing Aubin's manufacturing plant. Smith learned that Aubin was "hand batching" the wheels, which meant that the polyurethane was being applied on the wheel core by hand.

10

23.  Honda rarely committed as to the number of casters it would need until the last minute.

24.  Honda would go for weeks without submitting an order for casters and then place a large order, expecting it to be filled immediately.

25.  Wellington/Standex considered obtaining a poly/aluminum donut style wheel from other sources, including certain overseas companies that make a substantially similar wheel.

26.  Jarvis, which was owned by Standex, already made a poly/aluminum donut wheel, and Jarvis was asked to make some samples for Wellington/Standex.  Wellington/Standex eventually called this poly/aluminum donut style wheel the "Magnum" wheel.

27.  Wellington/Standex, through its sister company Jarvis West, made several samples of what would become the Magnum wheel.  These samples were also provided to Radford.

28.  Radford testified at her deposition that Smith assured her the Magnum wheel was the same specification and the same quality as the wheels Honda had tested.

29.  Radford also testified at her deposition that Honda specified the color of the wheel for the casters it orders and that if a different color wheel was provided as part of a caster, the caster would not meet Honda's purchase order.

30.  In 2001, Wellington/Standex had concerns that Jarvis West would not be able to keep up with the production needs for what would eventually be called the Magnum wheel. Wellington/Standex decided to outsource the production of the Magnum wheel and contracted with one company to produce the aluminum cores of the wheel and contracted with another company to apply polyurethane on the wheels.

31.  In 2001, Wellington/Standex filled caster orders with both Half-Round wheels and Magnum wheels because it still had Half-Round wheels in inventory.

11

32. Sometime in August 2002, Phil Aubin learned that Wellington/Standex was making the Magnum wheel. He was angry and told Radford that the casters Honda had purchased in the past contained a wheel made by Aubin but the new casters contained wheels made by Wellington.

33. After Aubin discovered that defendants had manufactured an imitation of its Half-Round wheel, defendants cancelled all outstanding orders with plaintiff and ceased doing business with plaintiff.

34. Radford told Aubin that Honda never questioned who the manufacturer of a wheel was and that Honda ordered casters from suppliers.

35. After Aubin had contacted her, Radford contacted her supplier of the Wellington casters, Caster Connection, to determine whether the new wheel met Honda's testing specifications. Caster Connection set up a meeting with individuals from Wellington/Standex and Honda to discuss this issue. The meeting occurred on August 20, 2002. As Radford testified at her deposition, the primary discussion at the meeting was whether "the product delivered through Caster Connection would meet Honda's expectation."

36. Radford testified at her deposition that she was assured the casters that Wellington/Standex was supplying met Honda's specification. After the meeting, Radford did not request that Wellington/Standex switch back to using the Aubin Half-Round wheel.

37. Both Radford and Dan Knapp, a Honda employee, testified at their depositions that Smith did not tell them who manufactured the wheels for the casters he supplied.

12

38.     Knapp further stated that he had no expectation that the wheels Wellington/Standex
        supplied came from one manufacturer; he even expected and assumed that some of the
        wheels in the casters came from overseas.

39.     At times, Honda purchased poly/aluminum balloon wheels - like Aubin's Half-Round
        wheels - from sources other than Wellington.

40.     Aubin offered to sell Honda the Half-Round wheel directly and offered to price the
        product.  Aubin sent the pricing directly to Honda, but Honda never ordered any Half-
        Round wheels from Aubin.

41.     During the due diligence process of selling Standex's caster business, Deborah Rosen, the
        company's Vice-President and Chief Legal Officer, found an unsigned supply agreement
        between Aubin and Standex dated "May ___, 2001" , which was near the time Aubin had
        faxed Smith an offer for a three-year contract.

42.     In 2004, Rosen sent a letter to Aubin stating their agreement was terminated because of
        the sale of the business.  Phil Aubin testified at his deposition that he had never seen the
        unsigned agreement until Rosen mailed it to him in 2004.  Phil Aubin called Rosen and
        asked her for a copy of the signed agreement.

43.     Rosen sent a follow-up letter to Phil Aubin informing him of her mistake and confirming
        that there was no agreement between the parties.

44.     In 2000, 2001 and 2002, the Aubin Half-Round wheel was not copyrighted or
        trademarked.

45.     In 2003, Standex sold the Wellington business, as well as its other caster operations, to
        defendant Colson Caster and Colson Caster Limited.

## IV. Summary Judgment Standard

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination of an action.  This Court may only grant summary judgment as a matter of law when the moving party has identified, as its basis for the motion, an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)).  The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)).

The court is not to weigh the evidence and determine the truth of the matter but is to decide whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.  There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* at 249 (citing *Cities Serv.*, 391 U.S. at 288-289).  The Court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as matter of law." *Id.* at 251-52.  If the evidence is merely colorable, *Dombrowski v. Eastland,* 387 U.S. 82, 84 (1967), or is not significantly probative, *Cities Serv.*, 391 U.S. at 290, judgment may be granted. *Anderson*, 477 U.S. at 249.

**V. Opinion**

A. Breach of Contract

To prove a breach of contract under Ohio law, plaintiff must establish the existence of a contract, performance by the plaintiff, breach by the defendant, and damage to the plaintiff. *Doner v. Snapp,* 98 Ohio App.3d 597, 600, 649 N.E.2d 42, 44 (1994). The elements of a valid contract are an offer, acceptance, and consideration. *Brantley Venture Partners II, L.P. v. Dauphin Deposit Bank and Trust Company,* 7 F.Supp.2d 936, 945 (N.D. Ohio 1998). If any of these requirements is not fulfilled, there is no contract. *Id.* Moreover, for a contract to exist, the parties must have a meeting of the minds. *Noroski v. Fallet,* 2 Ohio St.3d 77, 79, 442 N.E.2d 1302, 1304 (1982).

In order to enforce a contract, the court must be able to determine the terms of the contract. *Vargo v. Clark,* 128 Ohio App.3d 589, 595, 716 N.E.2d 238, 242 (1998). Vagueness of expression, indefiniteness, and uncertainty as to any of the essential terms of an agreement prevent the creation of an enforceable contract. *Id.* (citing *Rulli v. Fan Co.*, 79 Ohio St.3d 374, 376, 683 N.E.2d 337, 338-339 (1997)).

1.  Breach of Distributorship Agreement

Plaintiff cannot prevail on its claim for breach of a distributorship agreement because it has failed to establish the existence of a valid distributorship agreement between it and defendants. Plaintiff alleges that Phil Aubin and Jeff Smith agreed over the telephone in late 1998 that Wellington would purchase its requirements for Half-Round wheels from Aubin, and in exchange, Aubin would manufacture as many of its wheels as Aubin could sell, with the caveat that Wellington would not sell in Canada or to Ford Motor Company in the United States because

15

of the existing exclusive requirements agreement between plaintiff and Bestway. Plaintiff has failed to produce any evidence, however, to show that the parties, sophisticated business entities, ever reached an agreement as to the basic terms of the alleged agreement. Phil Aubin testified at his deposition that the parties did not reach any agreement as to the price of the units to be purchased; the quantity; the shipping terms; the length of the agreement; how the agreement could be terminated; whether the wheels would be distributed as a component of a caster or otherwise; or whether the wheels were warranted. Aubin depo. pp. 214-15. In fact, Phil Aubin testified that he and Smith did not discuss any specific terms, aside from the fact that Aubin would sell the wheels to Wellington for distribution and Wellington would distribute the wheels to the automotive industry, and Phil Aubin stated there were no other discussions of the agreement beyond the initial thirty-minute phone conversation. *Id.* The oral agreement that Phil Aubin and Smith reached in late 1998 is not sufficiently definite to evince an intention by both parties to be contractually bound by an ongoing, exclusive distributorship agreement. The fact that defendants did market the wheels to the automotive industry, supplied samples of the wheels to the automotive industry for testing, and purchased thousands of the wheels and distributed them to the automotive industry, and the fact that plaintiff sold its Half-Rounds wheels for distribution to automobile manufacturers in the United States exclusively to defendants for a period of time, does not demonstrate that the parties intended to be bound by a distributorship contract for a fixed period of time.

Even if there were a distributorship agreement between the parties, plaintiff has not shown a breach of the agreement by defendants. Plaintiff has not shown that defendants failed to market

16

its product prior to the date defendants allegedly ceased doing business with plaintiff, which was August 15, 2002, when plaintiff received a fax notification from defendants cancelling its outstanding order.  Phil Aubin depo., pp. 309, 313.  Nor has plaintiff shown that cancellation of an outstanding order constituted a breach of the alleged distributorship agreement.  Accordingly, defendants are entitled to summary judgment on plaintiffs' claim for breach of a distributorship agreement.

2.  Breach of Requirements Contract

For the same reasons discussed in connection with plaintiff's breach of distributorship agreement, defendants are likewise entitled to summary judgment on plaintiff's claim for breach of a requirements contract.  As additional evidence to support its claim that the parties had a sufficient understanding of the terms and conditions of a requirements contract between them, plaintiff points to an unexecuted "Exclusive Supply Agreement" drafted by Standex in May 2001. An agreement that was never executed by the parties, however, in no way evidences an intention by either party to be bound by the terms contained in such agreement or a belief on the part of the drafting party that it is already bound by the terms of the unexecuted document.

Defendants are entitled to summary judgment on this claim for the additional reason that the statute of frauds is not satisfied.  The statute of frauds, as codified at Ohio Revised Code § 1302.04, provides as follows:

> (A) Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this division beyond the quantity of goods shown in such writing.

17

It is undisputed that the alleged requirements contract was for the sale of goods, the price was for five hundred dollars or more, and the alleged original contract is not in writing.

Plaintiff nonetheless alleges that its claim is not barred by the statute of frauds because there is a writing that satisfies the merchants exception to the statute of frauds. The merchants exception provides,

> (B) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of division (A) of this section against such party unless written notice of objection to its contents is given within ten days after it is received.

For a writing to be "sufficient against the sender," it must meet the requirements set forth in R.C. 1302.04(A). First, the writing must be signed by the party to be charged. *Puritan Systems, Inc. v. M.G. Industries, Inc.*, 1997 WL 775681, *2 -4 (Ohio App. 9 Dist.,1997). Second, the writing must indicate that there has been a completed transaction for goods, not a future transaction. *Id.* Third, the writing must state the quantity of goods involved. In the case of a requirements contract, a writing indicating that a buyer would get its supply of a product from the seller and giving a definite time frame to the agreement may be sufficient to fulfill the quantity term requirement. *Id.* Whether a writing is sufficient against the sender is a question of law. *Id.*

The writing on which plaintiff relies to satisfy the merchants exception is a one-page fax cover sheet sent from Phil Aubin to Smith on May 4, 2001. The sheet is signed only "Phil." It reads: "Pricing: 3 Yr contract 10,000 per month minimum beg 6/1 or later." The sheet then lists a series of prices followed by "F.O.B. Factory" and "Terms 2% - 10 Net 30." The court finds that the sheet does not satisfy the merchants exception as a matter of law for a number of

18

reasons. First, the writing was not sent within a reasonable time after the parties entered into the alleged requirements contract but was instead sent well over two years later. Second, the writing is not signed by Wellington, the party to be charged. Third, the writing does not indicate that it is for a completed transaction. The writing clearly does not confirm a requirements contract allegedly entered into in late 1998 but instead expressly refers to a three-year contract to begin at a future unspecified date. For these reasons, the statute of frauds applies to bar plaintiff's claim for breach of a requirements contract.

3. Breach of Joint Venture/Partnership

In Count III of the Second Amended Complaint, plaintiff alleges that defendants Wellington and Standex breached a joint venture and partnership agreement. Wellington moves for summary judgment on plaintiff's claim for breach of a partnership agreement. Plaintiff moves for summary judgment on its claim for breach of the joint venture. In so doing, plaintiff concedes that the relationship between it and Wellington does not rise to the level of a partnership. Accordingly, the court will consider only whether plaintiff has produced sufficient evidence to prevail as a matter of law on its breach of joint venture claim.

Ohio law defines a joint venture as "'an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill and knowledge, without creating a partnership, and agree that there shall be a community of interest among them as to the purpose of the undertaking, and that each coadventurer shall stand in the relation of principal, as well as agent, as to each of the other coadventurers. . .'" *Grendell v. Ohio Environmental Protection Agency,* 146 Ohio App.3d 1, 11, 764 N.E.2d 1067, 1075 (2001) (citing

19

*Al Johnson Constr. Co. v. Kosydar*, 42 Ohio St.2d 29, 325 N.E.2d 549, syll. ¶ 1 (1975) (quoting *Ford v. McCue*, 163 Ohio St. 498, 127 N.E.2d 209, syll. ¶ 1 (1955).  The elements of a joint venture are: (1) a contract, express or implied; (2) the intent to associate as joint venturers; (3) contributions from each co-venturer to the common enterprise; (4) equal control or authority of the co-venturers over the enterprise, (5) an agreement to share profits and a sharing of losses, and (6) a single enterprise as opposed to a continuing business.  *Carey v. Seeley's Ceramic Service, Inc.*, 1994 WL 124849, *2 (Ohio App. 2 Dist.,1994) (citing *Mill Creek Builders, Inc. v. James Waltz Custom Builders*, (Dec. 20, 1991), Lucas App. No. L-90-316, unreported).

Plaintiff has not come forward with sufficient facts to prevail as a matter of law on its claim for breach of a joint venture or to even show the existence of a joint venture.  First, there is no showing that the parties intended to enter into a joint venture and there are not sufficient facts from which it could reasonably be inferred that the parties intended to associate as joint venturers.  In addition, the record is devoid of evidence that each party had the right or authority to direct the movements and conduct of the other.  Finally, there is no evidence that the parties had an agreement to share profits and losses.  For these reasons, plaintiff cannot proceed on its claim for breach of a joint venture.

### B.  Fraudulent Misrepresentation

In order to establish a claim of fraud under Ohio law, a plaintiff must prove the following elements: "a) a representation or, where there is a duty to disclose, concealment of a fact, b) which is material to the transaction at hand, c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

20

d) with the intent of misleading another into relying upon it, e) justifiable reliance upon the representation or concealment, and f) a resulting injury proximately caused by the reliance." *Burr v. Bd. of County Com'rs. of Stark County,* 23 Ohio St.3d 69, 73, 491 N.E.2d 1101, 1105 (1986).

Fraud generally cannot be predicated upon promises or representations relating to future actions or conduct. *Tibbs v. National Homes Const. Corp.*, 52 Ohio App.2d 281, 287, 369 N.E.2d 1218, 1223 (Ohio App. 1977). "Representations as to what will be performed or will take place in the future are regarded as predictions and are not fraudulent, irrespective of whether the matter is before the court as an action for the deceit or defensively as a ground of avoidance of a written contract. A false assertion presupposes that an event has occurred, that a duty has been performed, that a fact has intervened or that an authority exists, either or all of which may have reduced the contract or prevented its being consummated." *Id.* (citing 24 Ohio Jurisprudence 2d 646, 647, Fraud and Deceit, Section 38.) Where one make a "promise of future action, occurrence, or conduct, and who at the time he makes it, has no intention of keeping his promise," then "the requisite misrepresentation of an existing fact is said to be found in the lie as to his existing mental attitude and present intent." *Id.* at 286, 369 N.E.2d at 1222.

A party must prove not only that he acted in reliance on a material misrepresentation, but also that he had a right to do so. *Columbia Gas Transmission Corp. v. Ogle,* 51 F.Supp.2d 866, 875 (S.D. Ohio 1997) (Graham, J.). Reliance is "that degree of care which would be exercised in an average transaction between persons under similar circumstances. . ." *In re Landon,* 37 B.R. 568, 571 (Bnkrptcy. N.D. Ohio 1984). Factors to be considered in determining whether reliance is reasonable include "the nature of the transaction, the form and materiality of the representation, the relationship of the parties, the respective intelligence, experience, age and mental and physical

condition of the parties, and their respective knowledge and means of knowledge." *Ogle,* 51 F.Supp.2d at 875 (citing Ohio cases). An individual "has no right to rely on misrepresentations when the true facts are equally open to both parties." *Id.* at 875-76 (citing *Aetna Ins. Co. v. Reed,* 33 Ohio St. 283 (1877); *Van Horn v. Peoples Banking Co.,* 64 Ohio App.3d 745, 582 N.E.2d 1099 (1990)).

As a general rule under Ohio law, an individual "is expected to conduct his or her dealings with proper vigilance." *Dito v. Wozniak,* 2005 WL 19437 * 4 (Ohio App. 9 Dist.) (citing *Foust v. Valleybrook Realty Co.,* 4 Ohio App.3d 164, 165, 446 N.E.2d 1122 (1981). "Such vigilance imputes a duty upon one to reasonably investigate the truth of representations made prior to reliance thereon." *Id.* An individual must avail himself of information that is easily accessible to him. *In re Landon,* 37 B.R. at 570 (citing 24 Ohio Jur.2d *Fraud and Deceit* § 136).

In its opposing memorandum, plaintiff alleges that Smith made misrepresentations to plaintiff throughout their business relationship that "things were going well" and business was "moving along," causing plaintiff to take action to expand his facilities. Plaintiff alleges that it also took action based on Smith's misrepresentation that they could expect 360,000 units over the next three years based on Honda's projections. Plaintiff claims that Phil Aubin called his suppliers to get the best price he could on his materials and hired an addition 10 to 12 employees in response to the increased sales to Honda and Smith's representation that "things were going well."

Plaintiff also alleges that Smith made misrepresentations in April 2002 that business with Honda was slow because the economy had shifting in early 2002 and Honda was reviewing budgets when in fact Aubin was selling fewer wheels because Wellington was substituting its

22

wheels for plaintiff's.  Plaintiff alleges that it justifiably relied on these misrepresentations because it continued to do business with defendants and to honor the exclusive distributorship agreement it had established with defendants and did not take any action to investigate why business with Honda was slow or the possibility that defendants had misappropriated its trade secrets and were manufacturing a duplicate of plaintiff's wheel and substituting their wheel for plaintiff's wheel.

The court finds that plaintiff has failed to come forward with sufficient evidence to create a genuine issue of material fact on its claim for fraudulent misrepresentations.  As to the projection that Honda would need 360,000 wheels over a three-year period, the alleged misrepresentation relates to a future occurrence.  Plaintiff testified at his deposition that this was simply a projection, there was no contract with Honda for this quantity, and there was no guarantee that Honda would in fact require this number of wheels.  In addition, plaintiff could have sought independent verification of Honda's future needs rather than relying strictly on information supplied by defendants.  Finally, plaintiff has not shown that it relied on this representation and the representation that "things were going well" and business was "moving along" to its detriment.  Phil Aubin testified at his deposition that he hired additional employees due to actual increased business with Honda in late or early 2001 to mid- 2002 and that he expanded his facilities for the new business he and Smith had created, which was becoming high volume, but the increased business is a reason for the additional hirings and expansion that existed independent of any representations made by Smith.  (Aubin depo. p. 156).  Phil Aubin also testified that he called suppliers to get the best prices on materials, but he does not explain how this was in any way detrimental to plaintiff.

Plaintiff likewise has not shown that it relied to its detriment on Smith's representation in April 2002 that business with Honda was slow.  Plaintiff argues in its opposing memorandum that "For defendants to assert that Plaintiff took no action based upon the misrepresentations of Defendants is unfounded and contrary to the evidence in this case."  However, plaintiff concedes that it in fact took no action in response to this misrepresentation.  Plaintiff states in its opposing memorandum that it "reasonably relied upon the misrepresentations of Defendant Smith and did not take any action to investigate any further why business with Honda was slow or the possibility that Defendants had misappropriated its trade secrets and were manufacturing a duplicate of its wheel "and substituting their product for plaintiff's wheel.  Philip Aubin testified at his deposition that he took no action in response to Smith's alleged misrepresentation that business with Honda was falling off.  (Phil Aubin depo. pp.  339-40).

Finally, defendants' representations that things were going well, that business was moving along, and subsequently that business with Honda was slow, are much too vague for plaintiff to have taken specific action in reliance thereon, such as expanding his business and hiring additional employees.  At the very least, plaintiff could have investigated for itself what Honda's demand for its wheels actually was before acting on defendants' vague representations as to the general state of its business.

For these reasons, plaintiff has failed to come forward with sufficient evidence to establish the elements of its claim for fraudulent misrepresentation.  Defendants are therefore entitled to summary judgment on this claim.

24

C.  Misappropriation of Trade Secrets

Plaintiff claims that its entire process, method and formula for the composition and manufacturing of its Half-Round wheel is a trade secret entitled to protection under Ohio Rev. Code § 1333.61.  Section 1333.61(D) defines a trade secret as follows:

> 'Trade secret' means information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

The factors that the trial court must consider in determining the existence of a trade secret under Ohio law are (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.,* by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information withheld from competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information." *Procter & Gamble Co. v. Stoneham,* 140 Ohio App.3d 260, 272, 747 N.E.2d 268, 277 (2000) (citing *Pyromatics, Inc. v. Petruziello***,** 7 Ohio App.3d 131, 134-135, 454 N.E.2d 588, 592 (1983)). Information constitutes a trade secret only if the information is not publicly known or readily ascertainable to the public.  *State ex rel. The Plain Dealer v. Ohio Dept. Of Ins.,* 80 Ohio St.3d 513, 529, 687 N.E.2d 661, 675 (1997).  A confidentiality agreement between two private parties is not enough, standing alone, to establish trade secret protection.  *The Plain Dealer,* 80 Ohio St.3d at

532, 687 N.E.2d at 677.  The item for which trade secret protection is claimed must also have some independent economic value.  *Id.*

Plaintiff claims that the factors to be weighed demonstrate that its manufacturing process for the wheel is a trade secret entitled to protection.  Plaintiff contends that the process is not known by persons outside the business (Phil Aubin depo., p. 292); all employees sign confidentiality agreements when they start work at Aubin (Phil Aubin depo., pp. 94-95); Honda's test results for measuring the performance of the wheel were confidential (Pati Radford depo., p. 51); defendants learned the exact test results and how the wheel performed only due to their joint venture and confidential relationship with plaintiff; Phil Aubin took extensive precautions to guard the secrecy of Aubin's trade secrets by not sharing the design drawings with anyone other than those individuals who assisted him in manufacturing the wheel and no one but him had access to the computer on which the drawings are saved (Phil Aubin depo. p. 105); only employees and delivery personnel have access to plaintiff's manufacturing facilities (Phil Aubin depo., p. 296); and plaintiff's facility is kept locked and closed during non-business hours (plaintiff's exh. K).  Plaintiff also claims there was a huge value in plaintiff having is manufacturing process withheld from competitors, which is demonstrated by the amount of sales to Honda that plaintiff and defendants generated when they displaced the previous supplier to Honda and by the amount of sales plaintiff lost when defendants undercut its sales.  Plaintiff also claims that it developed and designed its wheel over a period of time, beginning in early 1995 and continuing throughout 1996, and defendants did not take the time to develop their own wheel but simply manufactured a duplicate of plaintiff's wheel, which had already been tested and approved for use at Honda.

Defendants counter that plaintiff has failed to introduce any evidence that its "entire

manufacturing process" meets the definition of a trade secret under Ohio law. Defendants allege that the testimony in this case shows that the process for making these wheels is not secret; rather, the process is the simple one of taking an aluminum core and coating it with polyurethane. Defendants also allege that plaintiff did not take reasonable steps to keep the process secret and plaintiff has produced no evidence to demonstrate that its alleged trade secret derives independent economic value from not being known to others. Defendants also contend that Honda's testing of the wheel and its test results are of no significance to the trade secret claim.

Upon a careful review of the record, the court finds that plaintiff has not produced sufficient evidence to establish that its wheel or any portion of its manufacturing process constitutes a trade secret. At his deposition, Phil Aubin admitted that plaintiff was not claiming that the wheel itself or the design of the wheel is a trade secret but was alleging instead that the manner in which plaintiff handled its productivity was a trade secret. (Phil Aubin depo., p. 160). He described the purported trade secret as maintaining large inventories of castings and then applying treads as orders came in, "without having to increase tremendous inventories of each individual compound finished wheel," and maintaining deliveries to customers. (Phil Aubin depo., pp. 159-60). He claimed that what was unique about plaintiff's process was "the timing at which [plaintiff] employed" each of the steps of the manufacturing process. (Phil Aubin depo., pp. 164-166).

Although Phil Aubin claimed that the manufacturing process itself was a trade secret, he admitted that the majority of the steps of the manufacturing process were not unique and that the only steps that might be unique were those that involved placing the aluminum hubs in the sandblasting booth to clean them and placing the bonding agent on the wheel with an air brush gun

27

(Phil Aubin depo. pp. 160-164). Plaintiff has pointed to no other evidence to show that it employed processes that were unknown to others inside or outside the business, that there was any value in withholding information regarding its process from competitors, that it had spent an appreciable amount of time and money developing its process, or that it would take an appreciable amount of time and expense for a competitor to acquire information regarding the process and to duplicate it. Plaintiff has offered only vague allegations as to the amount of effort or money expended in obtaining and developing its manufacturing process and the amount of time and expense it took for defendant to acquire and duplicate the process. Plaintiff's general conclusions are not sufficient to support a finding that its manufacturing process derived independent economic value from not being known to others.

In addition, plaintiff has not offered evidence that shows it took reasonable steps to keep its process secret. Although plaintiff kept its facilities locked during non-business hours and kept its drawings and computer secured, these are typical precautions that any business owner would be expected to take for simple security purposes. Plaintiff has not shown that it enacted any measures beyond these to protect the secrecy of its manufacturing process.

Finally, plaintiff alleges that Honda had tested and approved its manufacturing process, but there is no support in the record for this allegation. While the evidence shows that Honda had tested and approved plaintiff's wheel, there is no evidence that Honda had tested and approved

plaintiff's process used to manufacture those wheels. In any event, plaintiff has not shown how it derived independent economic value from Honda's approval of plaintiff's wheel for Honda's use.

Assuming plaintiff could establish that its manufacturing process constitutes a trade secret, the question then becomes whether plaintiff has come forward with sufficient evidence to support a finding that defendants misappropriated this trade secret. Ohio Rev. Code § 1333.61(B) defines "misappropriation" as any of the following:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;
> (2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:
> (a) Used improper means to acquire knowledge of the trade secret;
> (b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;
> (c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Plaintiff alleges that defendants misappropriated its trade secrets when they manufactured a donut-style polyurethane on aluminum wheel which was an imitation of plaintiff's Half-Round wheel. As sole support for their misappropriation claim, plaintiff cites evidence that defendants duplicated plaintiff's wheel, as well as knowledge regarding plaintiff's manufacturing process for its wheel, and the fact that such process had been tested and approved by Honda, directly from the confidential relationship defendants had established with plaintiff over several years. Plaintiff specifically alleges that Smith learned of plaintiff's trade secrets when he visited plaintiff's plant in May 2001. Plaintiff states that it does not matter that defendants could have gained information and knowledge from plaintiff's publicly available product or by studying expired patents. Plaintiff

29

alleges that defendants do not have any evidence that they did not misappropriate its trade secrets since the declarations they have submitted in support of their position contain inappropriate conclusions of law that the court should strike.

Defendants counter that plaintiff has not offered any proof of misappropriation. Defendants note that at his deposition, Phil Aubin testified that when Smith visited plaintiff's plaint in May 2001, he was there for a total of thirty minutes and did not obtain information regarding plaintiff's manufacturing process in an improper way (Phil Aubin depo., pp. 253, 256). Defendants contend that plaintiff has not presented any other evidence that defendants acquired information from plaintiff in an improper way. Defendants also argue there is no evidence that they are using any alleged trade secrets of plaintiff, and they have submitted declarations affirmatively stating this. Defendants assert that the mere duplication of plaintiff's wheel does not constitute misappropriation of a trade secret.

The court will not strike defendants' declarations but will disregard them for purposes of resolving the summary judgment motion. After reviewing the remainder of the record, the court finds that plaintiff has failed to come forward with sufficient evidence to permit a finding that defendants misappropriated a trade secret from plaintiff. First, there is no evidence that defendants gained knowledge of plaintiff's manufacturing process through improper means. Rather, the evidence shows that any knowledge defendants gained of plaintiff's manufacturing process was acquired when Smith toured plaintiff's plant, which was not an improper method. Second, there is no evidence whatsoever that defendants are utilizing plaintiff's manufacturing process. Third, defendants' duplication of plaintiff's wheel, standing alone, cannot support a misappropriation claim absent any evidence that defendants are using improperly acquired information to

30

manufacture the wheels. Because such evidence is lacking, defendants are entitled to summary judgment on plaintiff's claim for misappropriation of trade secrets.

### D. Ohio Deceptive Trade Practices Act/Unfair Competition

Plaintiff claims that defendants violated Ohio Rev. Code § 4165.02 and engaged in unfair competition when they misrepresented to their suppliers, users, and/or third parties that their "imitation" wheel was the same as the Half-Round wheel manufactured by Aubin. Plaintiff alleges that this misrepresentation allowed defendants to deceitfully switch their wheel into Honda's plants throughout North America without the wheels being subjected to rigorous testing by Honda, thereby wrongfully undercutting plaintiff's business. Plaintiff alleges defendants violated the Act when they "represented to Honda that their duplicate wheel was of the same approval, characteristics, and quality" of plaintiff's Half-Round wheel. Plaintiff alleges that defendant further misled Honda by showing test results of plaintiff's Half-Round wheel instead of defendants' duplicate wheel, which was not the same quality as plaintiff's wheel as evidenced by the fact that defendants' wheel began deteriorating and falling apart at Honda. Plaintiff also alleges that defendants represented the Aubin Wheel as a "Wellington wheel." Plaintiff alleges that defendants violated the Act when they sold Honda their wheel when Honda clearly intended and desired to purchase the wheel it had previously tested, ordered and approved.

Defendants contend that the Aubin wheels are considered generic pieces of equipment; Aubin did not put its name on the wheel; the wheel was just one part of the caster Wellington sold; Wellington does not tell its customers and distributors the name of the manufacturer of each part that is placed in a caster; Wellington did not represent that the Aubin wheel had been manufactured by Wellington; Honda never questioned who manufactured the wheel; and Honda

31

did not care where the wheels in the casters it bought came from as long as the wheels met

Honda's specifications.

Ohio Rev. Code § 4165.02 provides, in pertinent part,

(A) A person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person does any of the following:

(1) Passes off goods or services as those of another;

(2) Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) Causes likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another;
* * *
(7) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;
* * *
(9) Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another . . .

A defendant "passes off goods or services" as those of another "when a defendant attempts to

bring about consumer confusion by causing consumers to purchase its product under the mistaken

belief that they are in fact purchasing the plaintiff's goods." *Chandler and Associates, Inc. v.*

*America's Healthcare Alliance, Inc.,* 125 Ohio App.3d 572, 580, 709 N.E.2d 190, 195 (1997).  In

order for a § 4165.02 claim to lie, there must be some evidence that the purchaser or consumer was

misled into mistaking the defendant's product for the plaintiff's.  *See Leventhal & Assoc., Inc. v.*

*Thomson Central Ohio,* 128 Ohio App.3d 188, 714 N.E.2d 418, 423 (1998).  A claim for unfair

competition lies where one has made misrepresentations, "for the purpose of deceiving the public, that his goods are those of another." *Water Management, Inc. v. Stayanchi,* 15 Ohio St.3d 83, 85, 472 N.E.2d 715, 717 (1984).

Defendants are entitled to summary judgment on plaintiff's claim under the Deceptive Trade Practices Act and its claim for unfair competition because there is no evidence that defendants passed off their wheels as Aubin wheels or deceived Honda into buying their wheel when Honda intended to purchase the Aubin wheel instead. Rather, the evidence affirmatively shows that defendants made no misrepresentations regarding the origin of the wheels. Pati Radford, who was responsible for establishing standard logistics practice and procedures for inbound supply parts, including wheels and casters, for Honda of American Manufacturing, testified at her deposition that in the fall of 2001, she purchased wheels from Caster Connection under the Wellington name, but she is not aware of who manufactured the wheels. (Radford depo., p. 50). Radford testified that Phil Aubin called her with a concern in August of 2002, and that prior to that time, it was unquestioned who the manufacturer of the Wellington wheel was, it was simply represented as a trade name. (Radford depo., p. 59). Radford testified that after the call, Honda representatives met with representatives of defendants to address concerns that the Wellington wheel met the same specification as the Aubin wheel; that while Smith assured Honda that the Wellington wheels met the specification of the wheels that were tested, he never represented that the Wellington wheels were the wheels that had been tested; that Smith did not say who the test wheels came from; and that Smith did not say who manufactured test wheels. (Radford depo., pp. 58-65, 103). Radford also testified at her deposition that the purchase point of a wheel is of no consequence to Honda and she had no reason to specify that one wheel or the

33

other be used. (Radford depo., pp. 55, 106). Thus, there is no evidence that defendants attempted to mislead Honda into believing it was purchasing a wheel manufactured by Aubin when in fact Honda was purchasing a wheel manufactured by Wellington, and plaintiff therefore cannot establish a deceptive trade practice or unfair competition claim.

Furthermore, because Honda was not deceived into believing the Wellington wheels it purchased were Aubin wheels, plaintiff has not shown how it was damaged by the alleged failure of the Wellington wheels to meet Honda's quality control standards or specifications. Rather, any cause of action for a deceptive trade practice arising from Wellington's substitution of its wheel for Aubin's and the subsequent failure of the Wellington wheels to meet Honda's quality standards would lie with Honda, not with Aubin. For this additional reason, defendants are entitled to summary judgment on the Deceptive Trade Practices Act claim.

### E. Civil Conspiracy

Ohio law defines a civil conspiracy as "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Kenty v. Transamerica Premium Ins. Co.,* 72 Ohio St.3d 415, 419, 650 N.E.2d 863, 866 (1995). In order for a civil conspiracy claim to lie, there must be some underlying unlawful act. *Williams v. Aetna Fin. Co.,* 83 Ohio St.3d 464, 475, 700 N.E.2d 859, 868 (1998). Because plaintiff has not shown that defendants committed an unlawful act, defendants are entitled to summary judgment on the civil conspiracy claim.

F.  Injunction

Plaintiff is not entitled to proceed with its claim for injunctive relief since it has not come forward with sufficient evidence to create a genuine issue of material fact as to whether defendants are engaging in unlawful activity in connection with the manufacture and/or distribution of the Magnum wheel.

## VI.  Conclusion

In accordance with the foregoing, plaintiff's motion for summary judgment (doc. 73) and motion to strike (doc. 91) are **DENIED.**  Defendants' motions for summary judgment (docs. 70, 72) are **GRANTED.**  This case is **DISMISSED** and is **TERMINATED** on the docket of the Court at plaintiff's cost.

**IT IS SO ORDERED.**

<u>**/s/Timothy S. Black**</u>
Timothy S. Black
United States Magistrate Judge

35